Filed 6/25/14  Schmidt v. Bd. of Trustees, CSU CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| DIANE SCHMIDT, | C069835 |
| Plaintiff and Appellant, | (Super. Ct. No. 150151) |
| v. | |
| BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY CHICO et al., | |
| Defendants and Respondents. | |

In this action, plaintiff Diane Schmidt, a professor in political science at California State University, Chico, sued the Board of Trustees of the California State University[1] and several individuals for disability discrimination, harassment, retaliation, and other causes of action.  Defendants sought summary judgment on the ground that Schmidt had

---

[1]    We will refer to California State University, Chico and the Board of Trustees of the California State University interchangeably as the university.

1

released all of the claims asserted in this action by signing a settlement agreement two months before she commenced the action.  The trial court agreed and entered judgment for defendants.

On appeal, Schmidt primarily contends that when the extrinsic evidence she offered of the negotiations leading up to the settlement agreement is considered, the release provisions in the agreement are ambiguous and thus there is a triable issue of fact as to whether those provisions encompassed the claims asserted in this action.  We disagree.  Even considering the evidence of the negotiations, the release language in the settlement agreement is not reasonably susceptible to the interpretation Schmidt offers because her interpretation would require us to ignore a substantial part of that language, whereas the interpretation the university advances gives meaning to all of the release language in the agreement.  Thus, we conclude the trial court did not err in construing the settlement agreement as encompassing the claims asserted here.

We do, however, agree with Schmidt that the evidence she offered of the negotiation of the settlement agreement raises a triable issue of fact as to whether her release of the claims asserted here was procured by fraudulent misrepresentations made to her by a representative of the university.  If Schmidt can prove such fraudulent inducement to sign the settlement agreement, then she will be entitled to enforce *her* understanding of the release, rather than its broader, more comprehensive terms, and will therefore be allowed to proceed with her claims in this action.  Accordingly, we will reverse.

FACTUAL AND PROCEDURAL BACKGROUND

Schmidt has been a professor in the political science department at the university since 1998.  She is disabled because of back and neck injuries from a car accident and because she has fibromyalgia.

In December 2007, Schmidt filed a grievance with the university (R03-2007-433; hereafter, grievance 433), asserting "[d]iscrimination because of disability.  Improper

2

process that led to reprimand." According to Schmidt, this grievance related to a letter of reprimand she received in November 2007 based on an incident at a hiring meeting in April 2007. According to Schmidt, the participants at the meeting were arguing over potential job candidates. After two participants in the meeting made discriminatory comments about the older candidate, Schmidt asserted that the older candidate was in a protected class and another participant agreed. In response, Schmidt's supervisor, defendant Diana Dwyre, allegedly said, " 'Fine, I'll just write in the report that Diane says we have to hire a guy over 40.' " Schmidt responded, " 'well then why don't you put in that report all the shit you have been putting me through too.' " Schmidt later asserted that her outburst was related to medication she was taking for her medical conditions.

In February 2008, Schmidt filed another grievance with the university (R03-2008-022; hereafter, grievance 022), asserting "hostilities, including character assassination, threats, violation of academic freedom, verbal abuse, filing false/malicious complaints, instigating harmful rumors, violation of due process, violation of ADA accommodation, violation of free speech, violation of HIPAA privacy protection, [and] unauthorized performance review." In a later administrative response to this grievance, it was noted that "the majority of . . . Schmidt's claims [were] based upon incidents that occurred in late 2007."

In April 2008, Schmidt filed a third grievance with the university (R03-2008-171; hereafter, grievance 171), asserting "work overload" based on her course assignments for fall 2008 and spring 2009. As a remedy, she asked to be removed from assignment to a particular course (680) in both semesters. A later administrative response to this grievance in the fall of 2009 indicated that enrollment in course 680 requires permission of the instructor, Schmidt did not permit any student to enroll in her course 680 in the fall 2008 semester, and Schmidt was not listed as an instructor for course 680 after fall 2008.

In June 2008, Schmidt filed a complaint for disability discrimination and retaliation with the United States Department of Education, Office for Civil Rights. This complaint related to the letter of reprimand stemming from the April 2007 incident and the "hostile work environment" Schmidt claimed had ensued following that incident. Schmidt specifically mentioned the grievances she had filed in December 2007 and February 2008.

In September 2008, Schmidt filed a charge of disability discrimination and retaliation with the Equal Opportunity Employment Commission (EEOC) (and simultaneously with the California Department of Fair Employment and Housing (DFEH)), alleging "harass[ment] because of [her] disability," "a hostile work environment," and "retaliat[ion] against [her] because" she "participated in a protected activity . . . during an interview in April 2007." According to Schmidt, this latter complaint related to her comments at the hiring meeting in April 2007 regarding the older job candidate.

On the same day the EEOC received this charge, Schmidt sent defendant Gayle Hutchinson, dean of the college of behavioral & social sciences, via e-mail a "formal complaint" that she was "still experiencing a substantial hostile work environment which apparently continues from the unabated harassment and discrimination [she] experienced and reported . . . from September 2007 through May 2008." Schmidt specified that her current complaint was "related to actions against [her] from August 2008 to the present." Those actions included being voted off a faculty committee, "shunning" by other faculty, and "[a]ggressive behavior" such as being "virtually shoved away from the mailboxes."

In late September 2008, Schmidt met with her union representative and defendant Leslie Nix-Baker (vice provost for faculty affairs). In that meeting, Nix-Baker agreed to conduct an investigation and prepare a report relating to Schmidt's complaints and her treatment in the department. Subsequently, Nix-Baker promised many times to provide Schmidt with a copy of the investigative report.

In December 2008, Schmidt filed a fourth grievance with the university (R03-2008-491; hereafter, grievance 491) relating to the department process of funding sabbaticals. Apparently the only relief Schmidt requested was that she receive her sabbatical, and because she eventually did, her union ultimately (in May 2010) declined to take the matter to arbitration.

In September 2009, Schmidt met with Hutchinson and complained of retaliation, hostile work environment, and disability discrimination (among other things). Also in September, Nix-Baker told Schmidt that she had not yet completed the investigative report she had promised a year before but would make every effort to get it to Schmidt as soon as possible.

In October 2009, Schmidt filed a fifth grievance with the university (R03-2009-395; hereafter, grievance 395) asserting "[d]isability discrimination." Specifically, she complained of "[d]ifferential treatment with respect to [the] hand[ling of] workplace violence complaints" because she "was reprimanded . . . for saying a cuss word in an argument" when she "was disabled due to [a] medication reaction at the time," while "[n]on-disabled faculty who said the same word in a meeting . . . , who had violent altercations . . . , engaged in hostility . . . or who assaulted [her] were not reprimanded or processed."

On the same day she filed grievance 395, Schmidt also filed a sixth grievance (R03-2009-396; hereafter, grievance 396) in which she alleged that complaints she had made "regarding discriminatory retaliatory actions . . . and associated hostile work environment issues related to [her] disability ha[d] not been responded to by administration." Specifically, she complained that the investigative report Nix-Baker had promised had been "repeatedly stalled with no remedy." As part of her proposed remedy, she requested that Nix-Baker issue the report.

In November 2009, Nix-Baker sent Schmidt the level I responses to grievances 395 and 396. Schmidt communicated her intent to take the grievances to level 2 (a

faculty hearing committee). At the same time, she asked Nix-Baker for an informal resolution of the grievances. In mid-December, Nix-Baker notified Schmidt that she had a draft of an agreement but needed to show it to others and await their responses.

In early January 2010, Schmidt learned that Nix-Baker had retired during the semester break. Meanwhile, the grievance process on grievances 395 and 396 moved forward, with faculty members being chosen for the hearings that needed to be scheduled soon. On January 21, however, Jorge Salinas, director of labor relations at the university, transmitted a written settlement offer to Schmidt through her union representative, Richard Soares. The proposed agreement encompassed all six grievances Schmidt had filed with the university, as well as the complaints she had filed with the Department of Education and the EEOC. The draft agreement offered Schmidt $7,244, restoration of 15 days of sick leave, removal of the letter of reprimand from her file, a copy of Nix-Baker's investigative report, relief from teaching course 680, and sensitivity training within the college of behavioral & social sciences. It also included a release provision under which both sides released "all . . . liabilities of any kind whatsoever arising out of" the six grievances and the two complaints.[2]

---

[2]     The complete proposed release provision read as follows: "The parties, for themselves, their relatives, heirs, successors, assigns, attorneys, agents and representatives, release and forever discharge each other, and each other's relatives, heirs, successors, assigns, employees, attorneys, agents, officers, insurers, constituent universities, and representatives from all complaints, grievances, actions, causes of action, in law or equity, suits, administrative claims, attorneys' fees, debts, liens, demands, damages, injunctive relief, costs, expenses, agreements, promises, obligations or liabilities of any kind whatsoever, whether known or unknown, which the parties may have or claim against each other including but not limited to those arising out of the following grievances: 03-2007-433, 03-2008-022, 03-2008-171, 03-2009-396, 03-2009-395, 03-2008-491, and discrimination complaints 09-09-2088 (Dept of Education) and 550-2008-02335 (EEOC), including but not limited to, claims and/or charges filed with the Department of Fair Employment and Housing, The CA Department of Industrial Relations, the Equal Employment Opportunity Commission, Department of Education-Office of Civil Rights, under the Americans with Disability Act, CA Fair Employment

6

Schmidt immediately sent a copy of the draft agreement to an attorney for review. Three days later, on January 24, Schmidt sent a revised copy of the proposed settlement agreement to Soares and Salinas, indicating that her attorney had suggested the changes shown on the revision. Schmidt complained in her e-mail that the draft was "overly broad and vague, and it require[d] her to waive future rights." She further stated, "I have been consistently clear that I will not waive future rights, nor will I waive rights associated with laws that are not in dispute at this time. The agreement should only address grievances and causes of action pending at this point in time."

On February 2, Schmidt was notified that the hearings on grievances 395 and 396 were scheduled for February 17 and 26. On February 2 she also received a right-to-sue letter from the EEOC.

On February 3, Soares asked Schmidt for her "final say" on the university's settlement offer, and she responded (to Soares and Salinas) that she "ha[d]n't seen anything in writing from the administration concerning [her] revisions." She suggested that "[o]ne way to move this along [would be] to settle the grievance regarding the Nix-Baker investigation [grievance 396] simply by giving [her] the report" and "sever this grievance" from the others, with the university "respond[ing] to the rest of [her] revisions."

By February 8, Schmidt was unable to find an attorney to represent her at the upcoming grievance hearings, and the attorney who had reviewed the first draft settlement agreement for her was out of town. That day, Soares communicated to her the summary of a new settlement offer from the university. According to Soares, the

---

and Housing Act, Unruh Civil Rights Act, the Rehabilitation Act of 1973, Title VII 42 U.S.C. §2000e et seq., 42 U.S.C. §1983 and §1988, the Older Worker Benefit Protection Act, Age Discrimination in Employment Act, the California Whistleblower Protection Act and/or for discrimination, harassment, retaliation, injunctive relief, property damage, negligence, medical costs, earning losses, legal costs, attorneys' fees and any other legal claims and/or theories."

university was offering to remove the reprimand letter and associated reports from her file and provide her with Nix-Baker's investigative report in exchange for the elimination of grievances 433, 022, 395, and 396. Soares told her that the university was still willing to commit to the previous settlement agreement after she agreed to this new one. Because grievances 433 and 022 had already " 'ended' " at the university level in September 2009 when her union told her it was not going to appeal the decisions in those grievances, Schmidt believed that the university's new proposal would result in "only a limited, partial settlement" that would eliminate the upcoming hearings on grievances 395 and 396 in exchange for removal of the reprimand from her file and provision of Nix-Baker's investigative report.

Schmidt told Soares she wanted to discuss the university's new proposal with an attorney, but she was able to speak by telephone with the attorney who had reviewed the previous settlement proposal for her only briefly on February 10, and she did not have a draft of the new proposal at that time. Following that conversation, Schmidt told Soares she would not agree to include grievance 022 in the partial settlement because it was beyond the scope of what the hearings on grievances 395 and 396 would address. The university apparently found that acceptable, because Salinas represented in an e-mail that since they had been unable to reach agreement on a global settlement, the university was now offering to settle three grievances. Schmidt expressed some confusion about what the university was now willing to do. In response, Salinas wrote in an e-mail as follows: "This offer calls for resolution of grievances: 433, 395, and 396. In exchange for removal of the Letter of Reprimand, Workplace Violence Committee Report from your official personnel file and all department files. In addition, we would provide you with the 2008 Investigation report from Leslie Nix Baker. The other grievances and suits that you have will continue forward and will not be affected by this Settlement Agreement & Release. [¶] We can continue to have discussions about a global settlement should we

8

reach agreement on these matters. We have made a global settlement offer and we would be willing to continue to explore these options."

Schmidt understood from this e-mail that the agreement was limited to dropping only the three specific grievances with respect to the administrative process, and if she still wanted to file a lawsuit she was free to do so. Still, Schmidt sought further clarification that there would still be the opportunity to continue discussions about a global settlement including monetary and nonmonetary offers. Salinas responded, "*YES*." He further asserted that while the reprimand "would no longer exist in [her] personnel file or any other department file on campus," he would still have a copy because "there is still pending litigation."

Understanding that the terms of the settlement did not preclude her from pursuing litigation that could encompass all of her complaints, including those involving the reprimand, Schmidt told Salinas to send her the document and she would be "happy to sign it with these understandings and provisions." Less than an hour later, Salinas e-mailed her the proposed settlement agreement, saying, "We can sign this agreement right now. Let's get this resolved."

Schmidt was unable to discuss the proposed agreement with her attorney or retain another attorney to assist her before she signed the agreement the next day. She signed the agreement in reliance on Salinas's representation that "[t]he other grievances and suits that [she had would] continue forward and [would] not be affected by this Settlement Agreement & Release."

The agreement the parties signed on February 11, 2010, recited the filing of grievance 433 "alleging discrimination based on disability," grievance 395 "regarding an incident that occurred in April 2007 and differential treatment," and grievance 396 "alleging on-going hostile environment." The agreement provided that the university would remove the letter of reprimand and the workplace violence complaint from Schmidt's file and provide Schmidt with a copy of the 2008 investigation report; in

9

exchange, Schmidt would immediately withdraw all three grievances with prejudice. The agreement then provided as follows:

"5. The parties, for themselves, their relatives, heirs, successors, assigns, attorneys, agents and representatives, release and forever discharge each other, and each other's relatives, heirs, successors, assigns, employees, attorneys, agents, officers, insurers, constituent universities, and representatives from all complaints, grievances, actions, causes of action, in law or equity, suits, administrative claims, attorneys' fees, debts, liens, demands, damages, injunctive relief, costs, expenses, agreements, promises, obligations or liabilities of any kind whatsoever, which the parties may have or claim against each other arising out of the events, facts, claims and circumstances surrounding the following grievances: 03-2007-433, 03-2009-395, 03-2009-396, including but not limited to, claims and/or charges filed with the Department of Fair Employment and Housing, The CA Department of Industrial Relations, the Equal Employment Opportunity Commission, Department of Education-Office of Civil Rights, under the Americans with Disability Act, CA Fair Employment and Housing Act, Unruh Civil Rights Act, the Rehabilitation Act of 1973, Title VII 42 U.S.C. §2000e et seq., 42 U.S.C. §983 and §1988, the Older Worker Benefit Protection Act, Age Discrimination in Employment Act, the California Whistleblower Protection Act and/or for discrimination, harassment, retaliation, injunctive relief, property damage, negligence, medical costs, earning losses, legal costs, attorneys' fees and any other legal claims and/or theories.

"6. This Agreement pertains to the events, facts, claims and circumstances surrounding the following grievances: 03-2007-433, 03-2009-395, and 03-2009-396 only. Any and all other grievances, suits or claims that Employee is currently pursuing shall not be affected by the execution of this Agreement."

The agreement included an integration clause, as follows: "This Agreement contains the sole and entire agreement and understanding of the parties with respect to the

10

entire subject matter hereof, and supersedes any and all prior discussion, negotiations, commitments and understandings."

In April 2010, a little over two months after the parties signed the settlement agreement, Schmidt commenced this action by filing a complaint for damages against the university, Nix-Baker, Dwyre, and two others. She subsequently filed a 70-page first amended complaint (not including attachments), which is the operative pleading for our purposes, in which she alleged causes of action for discrimination, harassment, retaliation, and other theories. The events alleged in her complaint spanned from March 2000 through the present (the date of filing). With respect to the February 2010 settlement agreement, Schmidt alleged that it was merely "an agreement to withdraw two of the three pending formal grievances in exchange for receiving the 2008 investigative report and removal of the November 2007 Report and Reprimand from [her] personnel file."

In their answer to the first amended complaint, defendants alleged as an affirmative defense that by means of the February 2010 settlement agreement Schmidt had released them from all liability to her "relating to, among other things, the claims alleged in her complaint."

In June 2011, defendants moved for summary judgment (or summary adjudication) on the ground that Schmidt's action was barred by the February 2010 settlement agreement.[3] Defendants argued that the agreement "specifically releases defendants from claims arising from all facts, events, and circumstances surrounding the three grievances Schmidt filed: the same facts, events, and circumstances on which she

---

[3] As an alternate basis for summary adjudication of Schmidt's fifth cause of action, brought under the California Whistleblower Protection Act (Gov. Code, § 8547 et seq.), defendants asserted there was no evidence Schmidt exhausted her administrative remedies. We discuss this aspect of defendants' motion in section III of the Discussion, *infra*.

11

bases her causes of action in this suit." Anticipating Schmidt's response to the motion, defendants also argued that the parol evidence Schmidt would seek to introduce regarding the negotiations that led to the settlement agreement was "improper and irrelevant" because Schmidt was going to try to use that evidence to advance an interpretation of the settlement agreement that "contradicts [its] plain language."

In opposing the summary judgment motion, Schmidt argued the settlement agreement was void and the release provision was unenforceable due to mistake ("misapprehension") or lack of mutual assent based on fraud.

On August 26, 2011, the trial court granted the motion for summary judgment. A week later, Schmidt moved for reconsideration, claiming (among other things) that in recently reviewing documents defendants had produced only 11 days before her opposition to the summary judgment motion was due, she had discovered admissions by Salinas and others that the settlement agreement "was by no means the end." In particular, Schmidt produced an e-mail Salinas wrote on the day the agreement was signed, in which he told the others that the university had "a signed settlement agreement from . . . Schmidt resolving three (3) of her grievances," but they "were unable to reach a global settlement after over a week of negotiations. Initially, [Schmidt] had a total of seven (7) grievances and a complaint filed with the EEOC. Five of those grievances have been resolved and/or withdrawn. We still have to deal with Professor Schmidt's other issues. This is by no means the end." According to Schmidt, this evidence showed that Salinas and the others had committed perjury in their depositions in the case.

On October 14, the trial court granted the motion for reconsideration, but on reconsideration affirmed its earlier ruling granting summary judgment. The court concluded that the February 2010 settlement agreement was "unambiguous on its face and, therefore, parol evidence is inadmissible to interpret it." The court further concluded that the causes of action alleged in the first amended complaint were "encompassed

12

within the claims and causes of action released by [Schmidt] in the . . . Settlement Agreement."

The court entered judgment against Schmidt on October 26, 2011. Schmidt timely appealed.

DISCUSSION

I

*Interpretation Of The 2010 Settlement Agreement*

Schmidt's primary contention on appeal is that the trial court erred in construing the 2010 settlement agreement as encompassing the claims in the present action. She contends that when the extrinsic evidence she offered of the negotiations leading up to the settlement agreement are taken into consideration, "the release provisions of the settlement agreement may be reasonably interpreted as a limited release that did not affect [her] ability to pursue her EEOC complaint, which resulted in this lawsuit." As we will explain, we disagree.

To the extent Schmidt first claims the trial court erred in "refusing to provisionally consider [the] extrinsic evidence [she] offered . . . to demonstrate a latent ambiguity in the [settlement agreement]," we need not resolve this claim of error because "[w]e independently review an order granting summary judgment." (*Lackner v. North* (2006) 135 Cal.App.4th 1188, 1196.) Thus, irrespective of what the trial court did with respect to the extrinsic evidence in deciding to grant summary judgment, we will consider that evidence in accordance with applicable legal principles in reviewing the trial court's ultimate decision.

"The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation

13

urged, the extrinsic evidence is then admitted to aid in the second step--interpreting the contract." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) Following these rules, we will consider the extrinsic evidence Schmidt offered in opposition to the motion for summary judgment in determining whether the 2010 settlement agreement is reasonably susceptible to the interpretation urged by Schmidt.

As Schmidt acknowledges, paragraph 5 of the settlement agreement releases the university from all claims whatsoever "arising out of the events, facts, . . . and circumstances surrounding" grievances 433, 395, and 396, including any charge filed with the EEOC for discrimination, harassment, and retaliation. Significantly, Schmidt concedes that, "*read in isolation*, the broad language of paragraph 5 would foreclose the present lawsuit." Thus, she concedes that all of the claims at issue in the present action arise out of the events, facts, and circumstances surrounding grievances 433, 395, and 396. Her contention is that this broad release language from paragraph 5 of the agreement must be read in conjunction with the "equally broad" language of paragraph 6, the second sentence of which provides that "[a]ny and all other grievances, suits or claims that Employee is currently pursuing shall not be affected by the execution of this Agreement."

According to Schmidt, while she argued to the trial court that these two paragraphs were "inherently contradictory," she claims to now believe "that the two provisions can be largely reconciled." In her view, "If paragraph 5 is construed as an all-encompassing general release, . . . the second sentence of paragraph 6 is left meaningless." On the other hand, if the second sentence of paragraph 6 is understood as "carv[ing] out an exception to the broad language of the release contained in paragraph 5, effectively exempting the other claims [Schmidt] was pursuing from the scope of the release," "[t]his interpretation gives meaning to *both* paragraphs 5 and 6 of the settlement, and is entirely consistent with the intent of the parties as expressed in Salinas' email and Schmidt's declaration." Under Schmidt's interpretation of the agreement, "the parties intended that [Schmidt]

14

release only three administrative grievances, leaving her free to pursue her remaining grievances as well as the EEOC and DOE discrimination complaints, and any resulting civil suit." Relying on the extrinsic evidence, she contends that "for whatever reason, whether by poor drafting, time demands or by demand -- [Salinas] took boilerplate language for a general release of all claims, and tried, rather clumsily, to engraft that language into an agreement that the parties all intended to result in a very limited release of three administrative grievances."

Although her effort is valiant, Schmidt ultimately has to admit that her interpretation of the settlement agreement does not actually reconcile all of the provisions of paragraph 5 and paragraph 6. Indeed, she concedes that her reading of the agreement "negates some of the general release language from paragraph 5." In her view, however, "that is a necessary consequence when providing that the excepted grievances, suits and claims 'shall not be affected by the execution of this Agreement.' "

As we see it, Schmidt's interpretive efforts do more than negate "some" of the general release language from paragraph 5. Instead, Schmidt's interpretation of the agreement almost entirely guts that paragraph. According to Schmidt's construction, the broad release language in paragraph 5, when read in conjunction with paragraph 6, accomplishes only "a very limited release of three administrative grievances." For that to be true, however, we would have to read paragraph 5 as though most of the language in that paragraph were not there, as follows:

"The parties, for themselves, their relatives, heirs, successors, assigns, attorneys, agents and representatives, release and forever discharge each other, and each other's relatives, heirs, successors, assigns, employees, attorneys, agents, officers, insurers, constituent universities, and representatives from ~~all complaints, grievances, actions, causes of action, in law or equity, suits, administrative claims, attorneys' fees, debts, liens, demands, damages, injunctive relief, costs, expenses, agreements, promises, obligations or liabilities of any kind whatsoever, which the parties may have or claim~~

15

against each other arising out of the events, facts, claims and circumstances surrounding the following grievances: 03-2007-433, 03-2009-395, 03-2009-396, including but not limited to, claims and/or charges filed with the Department of Fair Employment and Housing, The CA Department of Industrial Relations, the Equal Employment Opportunity Commission, Department of Education Office of Civil Rights, under the Americans with Disability Act, CA Fair Employment and Housing Act, Unruh Civil Rights Act, the Rehabilitation Act of 1973, Title VII 42 U.S.C. §2000e et seq., 42 U.S.C. §1983 and §1988, the Older Worker Benefit Protection Act, Age Discrimination in Employment Act, the California Whistleblower Protection Act and/or for discrimination, harassment, retaliation, injunctive relief, property damage, negligence, medical costs, earning losses, legal costs, attorneys' fees and any other legal claims and/or theories."

We cannot accept a construction of the release language in the 2010 settlement agreement that requires us to ignore the greater part of that language. Furthermore, we need not do so when there is an alternate interpretation of the release language that does not require such wholesale jettisoning of the agreement's provisions. That alternate interpretation is this: Paragraph 5 releases the university from all claims whatsoever "arising out of the events, facts, . . . and circumstances surrounding" grievances 433, 395, and 396. As Schmidt admits, this "broad language" encompasses the present lawsuit. Paragraph 6 then confirms that the settlement agreement "pertains to the events, facts, claims and circumstances surrounding the following grievances: 03-2007-433, 03-2009-395, and 03-2009-396 only" and "[a]ny and all other grievances, suits or claims that Employee is currently pursuing shall not be affected by the execution of this Agreement." The first sentence of paragraph 6 thus confirms that the broad release contained in paragraph 5 encompasses only claims "arising out of the events, facts, . . . and circumstances surrounding" grievances 433, 395, and 396. The second sentence of paragraph 6 then confirms that the settlement agreement does not affect "[a]ny and all *other* grievances, suits or claims that [Schmidt was] pursuing" when she executed the

16

agreement, i.e., any and all grievances, suits or claims that Schmidt was pursuing at the time *other* than those "arising out of the events, facts, . . . and circumstances surrounding" grievances 433, 395, and 396.

Read in this manner, the second sentence of paragraph 6 is not "meaningless," as Schmidt contends. Rather, paragraph 6 operates as a whole to confirm what claims survive the broad release language in paragraph 5. Reading the agreement in this manner, we honor the rules of contract interpretation by giving meaning to all of the agreement's provisions -- something Schmidt's interpretation of the agreement does not do. (See *Heidlebaugh v. Miller* (1954) 126 Cal.App.2d 35, 38 [" 'The court will if possible give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable' "].)

To the extent this construction of the agreement may not be entirely reconcilable with the extrinsic evidence of the negotiations that led to the agreement, any such inconsistency is of no legal significance at this point because, as we have explained, extrinsic evidence is admissible to aid in the interpretation of the agreement only if the language of the agreement is reasonably susceptible to the interpretation the proponent of the evidence advances. (*Winet v. Price*, *supra*, 4 Cal.App.4th at p. 1165.) Here, we have concluded that the language of the settlement agreement is *not* reasonably susceptible to the interpretation Schmidt offers -- even though we have provisionally considered Schmidt's extrinsic evidence in analyzing the initial question of ambiguity. Given that conclusion, the extrinsic evidence is ultimately not admissible here and therefore any inconsistency suggested by that evidence cannot affect our interpretation of the agreement.

For the foregoing reasons, we find no error in the trial court's interpretation of the 2010 settlement agreement with respect to its effect on Schmidt's claims in this action.

17

II

*Fraud*

In the trial court, citing *Frusetta v. Hauben* (1990) 217 Cal.App.3d 551, Schmidt argued -- albeit in an abbreviated manner -- that the extrinsic evidence she offered raised a triable issue of fact as to fraud.[4] She renews that argument in somewhat greater detail on appeal. Specifically, she contends there is a triable issue of fact as to the validity of the settlement agreement based on false representations Salinas made to her in the negotiations leading up to the signing of the agreement. For their part, defendants contend there is no evidence the university made a promise without the intent to perform it and any reliance by Schmidt on promises Salinas made to her was unjustifiable as a matter of law.[5] For the reasons that follow, we agree with Schmidt.

At the outset, we observe that to the extent both sides discuss this issue as though Schmidt were asserting fraud in the nature of a "false promise" -- that is, "[a] promise made without any intention to perform" -- they are mistaken. The gist of Schmidt's fraud claim is that Salinas "misled her concerning the scope and effect of the settlement agreement he drafted," specifically, the scope and effect of the release language in the agreement. Such a claim does not invoke principles of promissory fraud; although there was valuable consideration for the release, the release that Schmidt gave the university

---

[4] Schmidt's trial court argument referred to "fraud in the factum," but that concept does not apply here. Fraud in the factum -- also referred to as fraud in the execution or inception of a contract -- occurs when the signer is deceived as to the nature of what he or she is signing, and the signer does not know that he or she is entering into a contract. (See *Frusetta v. Hauben*, *supra*, 217 Cal.App.3d at p. 556; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415.) Schmidt's claim of fraud here is properly characterized as fraud in the inducement.

[5] To the extent defendants contend Schmidt "does not challenge the validity of the Agreement," that contention is plainly wrong. Schmidt specifically contends the extrinsic evidence she offered "creates a triable issue of fact as to the validity of the settlement agreement."

18

did not require the university to do anything or refrain from doing anything in the future, and thus Salinas cannot be understood to have misled Schmidt about what the university would or would not do.

Rather than involving promissory fraud, Schmidt's claim of fraud here invokes a long line of cases involving fraudulent inducement to sign an overly broad release. *Frusetta v. Hauben*, *supra*, 217 Cal.App.3d at page 551 -- the case Schmidt cited in the trial court in support of her claim of fraud -- falls within that line of cases. As the court in *Frusetta* explained, "The California Supreme Court, in *Casey v. Proctor* (1963) 59 Cal.2d 97 [28 Cal.Rptr. 307, 378 P.2d 579], stated, 'It has often been held that if the releaser was under a misapprehension, not due to his own neglect, as to the nature and scope of the release, and if this misapprehension was induced by the misconduct of the releasee, then the release, *regardless of how comprehensively worded*, is binding only to the extent actually intended by the releaser.' " (*Frusetta*, at p. 557.)

"[A] release because of . . . deception practiced upon the claimant must be construed as a settlement of those matters only as to which the minds of the parties met, and may not be considered to be in satisfaction of anything not consented to by the plaintiff. . . . [¶] [I]n any case it is for the trier of the facts to determine what the plaintiff understood was covered by the writing and whether his understanding different from the writing was induced by the defendant. If a misconception be found and that the defendant was responsible therefor, the contract insofar as it purports to release claims other than those understood by the plaintiff to be included, is ineffective to that extent, and rescission and tender as to the excluded items are unnecessary. . . . [¶] It is the province of the jury to determine whether the circumstances furnished the opportunity for overreaching, whether the defendant or his agent took advantage of it, and whether the plaintiff was thereby misled." (*Jordan v. Guerra* (1943) 23 Cal.2d 469, 475-476.)

Here, viewing the evidence in the light most favorable to Schmidt (as we must do) (*Lackner v. North*, *supra*, 135 Cal.App.4th at p. 1196), we conclude there is a triable issue

19

of fact as to whether the university's representative, Salinas, was responsible for Schmidt's failure to understand that the broad release language in the settlement agreement Salinas drafted did far more than release the university from the three grievances specifically mentioned in the agreement.

As we have previously explained, on January 21, 2010, Salinas, in his capacity as director of labor relations at the university, transmitted a written settlement offer to Schmidt through her union representative, Soares, that specifically proposed to resolve all six grievances Schmidt had filed with the university, as well as the complaints she had filed with the Department of Education and the EEOC, in exchange for $7,244, restoration of 15 days of sick leave, removal of the letter of reprimand from her file, a copy of Nix-Baker's investigative report, relief from teaching course 680, and sensitivity training within the college of behavioral & social sciences. The draft global settlement agreement included a broadly worded release provision under which both sides released "all . . . liabilities of any kind whatsoever arising out of" the six grievances and the two complaints. Schmidt was able to have that draft reviewed by an attorney, who proposed various revisions to it, and Schmidt transmitted the proposed revisions back to Salinas a few days later. In sending the agreement back to Salinas, Schmidt communicated that his draft was "overly broad and vague" and she wanted the agreement to "only address grievances and causes of action pending at this point in time."

On February 2, 2010, more than a week after she had returned the proposed agreement to Salinas, without having heard anything from him, Schmidt learned that the hearings on her most recent grievances (395 and 396) had been scheduled for February 17 and 26 -- about two and three weeks in the future, respectively. At the same time, she also received her right-to-sue letter from the EEOC, which gave her 90 days to commence a civil action against the university. The right-to-sue letter was dated January 26, 2010, and showed that it had been copied to the university. Schmidt assumed that Salinas was aware of the right-to-sue letter in the negotiations that followed.

20

On February 3, Soares asked Schmidt for her "final say" on the university's settlement offer, and she responded to Soares and Salinas that she "ha[d]n't seen anything in writing from the administration concerning [her] revisions" to the global settlement agreement. To make some progress, she suggested narrowing the agreement to cover only grievance 396, which would be resolved by giving her a copy of Nix-Baker's investigative report.

Five more days passed. Finally, at 10:50 a.m. on the morning of February 8, Soares sent Schmidt an e-mail (copied to Salinas) with a summary of a new, limited settlement offer from the university. According to Soares, the university was willing to remove the reprimand letter and associated reports from her file and provide her with Nix-Baker's investigative report in exchange for "elimination of your grievances ending in 395, 396, 433, and 022." Soares told her the university was still willing to commit to the previous global settlement agreement after she agreed to this new one. He reminded her that "[t]ime [wa]s of the essence since [she] ha[d] one of [her] hearings for [grievances] 395/396 on Feb. 17th."

Schmidt told Soares she wanted to discuss the university's new proposal with an attorney, but she was able to speak with the attorney who had reviewed the previous global settlement proposal for her only briefly on February 10, and she did not have a draft of the university's new proposal at that time. Following that conversation, in an e-mail at 10:15 a.m. on February 10, which was copied to Salinas, Schmidt told Soares that she could accept "expunge[ment] of the reprimand letter and associated reports from all files" and provision of the investigative report "[i]n exchange for eliminating grievances 395, 396, and 433." She said she would not agree to include grievance 022 in the partial settlement because "[g]rievance 022 is part of the full settlement of all claims and is not related to grievance 395 or 396 for which we have hearings set up to resolve. Grievance 433 is related to the reprimand, and while it asks for a stop to the discrimination, it also asks for removal of the reprimand, so I reluctantly accept elimination of it as well."

21

Following this e-mail, there was confusion about what was to happen to the remainder of the global settlement proposal. In an e-mail to Soares and Salinas at 2:39 p.m., Schmidt posed the following question directly to Salinas:

"[W]hat exactly is CSU offering? Is it:

"Option A: Accept the previous offer (global settlement) as is.

"Option B: Accept the new offer (settle 395, 396, 433 etc[.]) without any opportunity for a final settlement including the monetary and non-monetary offers available in the global settlement.

"Option C: Accept the new offer (settle 395, 396, 433 etc[.]) with the opportunity for a final settlement including the monetary and non-monetary offers available in the global settlement once I have reviewed the Leslie report and if I'm willing to accept the global settlement terms."

In response, in an e-mail at 3:15 p.m., Salinas wrote as follows: "This offer calls for resolution of grievances: 433, 395, and 396. In exchange for removal of the Letter of Reprimand, Workplace Violence Committee Report from your official personnel file and all department files. In addition, we would provide you with the 2008 Investigation report from Leslie Nix Baker. The other grievances and suits that you have will continue forward and will not be affected by this Settlement Agreement & Release. [¶] We can continue to have discussions about a global settlement should we reach agreement on these matters. We have made a global settlement offer and we would be willing to continue to explore these options."

Schmidt understood from this e-mail that the agreement was limited to dropping only the three specific grievances, and if she still wanted to file a lawsuit she was free to do so. Still, she sought further clarification, asking Salinas in an e-mail at 3:35 p.m. if the university was offering her "Option C," which she characterized as encompassing "resolution of grievances: 433, 395, and 396" along with the opportunity to continue discussions about a global settlement including monetary and nonmonetary offers.

22

Salinas responded at 3:55 p.m., "*YES*." He further asserted that while the reprimand "would no longer exist in [her] personnel file or any other department file on campus," he would still have a copy because "there is still pending litigation."

Understanding that the terms of the settlement did not preclude her from pursuing litigation that could encompass all of her complaints, including those involving the reprimand, Schmidt responded to Salinas at 4:03 p.m., saying, "Well then, yes! Send me the document and I'm happy to sign it with these understandings and provisions." Less than an hour later, at 4:50 p.m., Salinas e-mailed her the proposed settlement agreement, saying, "We can sign this agreement right now. Let's get this resolved."

Schmidt was unable to discuss the proposed agreement with her attorney or retain another attorney to assist her before she signed the agreement the next day. She signed the agreement in reliance on Salinas's representation that "[t]he other grievances and suits that [she had would] continue forward and [would] not be affected by this Settlement Agreement & Release."

The foregoing evidence is sufficient to raise a triable issue of fact as to whether Salinas wrongfully induced Schmidt to sign the partial settlement agreement in which he had included broad release language encompassing all claims whatsoever "arising out of the events, facts, . . . and circumstances surrounding" grievances 433, 395, and 396, when he knew that she believed, based on his representations to her, that the release was going to encompass only resolution of the grievances themselves. There is evidence that Salinas knew Schmidt was operating under time pressure, because the first hearing on her most recent grievances was only a week away and because she had received her 90-day right-to-sue letter from the EEOC, and the trier of fact could find that he deliberately sought to take advantage of that pressure. (Recall his closing exhortation: "We can sign this agreement right now. Let's get this resolved.") From the draft of the partial settlement agreement Salinas ultimately provided, along with the earlier draft of the global settlement agreement he had prepared, the trier of fact could also find that all

23

along Salinas intended to keep in the draft the broad release language regarding the release of all claims whatsoever "arising out of the events, facts, . . . and circumstances surrounding" the named grievances, but at the same time he harbored the intent to keep this language in the agreement he was telling Schmidt that the partial settlement agreement provided only "for resolution of grievances: 433, 395, and 396. . . . The other grievances *and suits* that you have will continue forward and will not be affected by this Settlement Agreement & Release." (Italics added.) The trier of fact could reasonably conclude that this statement was calculated to lead Schmidt to believe that *only* the three grievances themselves were being resolved by the partial settlement -- particularly given the narrow scope of the relief that was being offered: removal of the letter of reprimand and provision of the investigative report. Indeed, it is particularly telling that at no time in the exchange of e-mails that occurred on February 10, the day before the parties signed the settlement agreement, did Salinas ever tell Schmidt that the partial settlement agreement was going to include the broad release language contained in the previous global settlement proposal with only slight modification. Instead, he represented, and confirmed Schmidt's understanding, that the partial settlement agreement would involve only the resolution of grievances 433, 395, and 396, and in exchange all she was going to get was the investigative report and removal of the reprimand from her file. He never told her the partial agreement would also involve the more sweeping resolution of any claims whatsoever arising out of the events, facts, and circumstances surrounding those grievances, which would be sufficient to also preclude any lawsuit that she might seek to bring based on the right-to-sue letter she had recently received.

To the extent defendants contend Schmidt "read and underst[oo]d the Agreement when she signed it," the evidence they cite consists only of Schmidt's admission that she read the agreement before she signed it and "believe[d]" she understood it. This evidence certainly does not support the suggestion that Schmidt's understanding of the agreement

24

when she signed it was consistent with our construction of the agreement now, four years later.

To the extent defendants contend Schmidt "represented to Salinas and . . . Soares [that] she had reviewed a draft of the Agreement 'with counsel,' " defendants are mistaken. From the e-mail chain on February 10, 2010, it clearly appears that all Schmidt had reviewed "with counsel" as of 10:15 that morning, when she made that statement, was Soares's summary of the terms of the university's new offer, which he had sent to her two days earlier. It was not until nearly 5:00 that evening that Salinas finally provided Schmidt with a draft of the new partial settlement agreement, only after Schmidt had agreed to sign it based on her understanding (confirmed by Salinas) that it would encompass only the "resolution of grievances: 433, 395, and 396."

Finally to the extent defendants rely on *Rosenthal v. Great Western Fin. Securities Corp.*, *supra*, 14 Cal.4th at page 394, that reliance is misplaced because *Rosenthal* involved a claim of fraud in the *execution*, which is distinguishable from a claim of fraud in the *inducement*. (See *id.* at pp. 402, 415.) Defendants fail to show that the principles articulated in *Rosenthal* applicable to the former type of fraud can be rightfully applied to the latter fraud at issue here. In the absence of such a showing, we are guided by the principles articulated in *Frusetta*, *Casey*, and *Jordan*.

Under those cases, on the evidence here, it is for the trier of fact to decide whether the circumstances furnished the opportunity for overreaching by the university, whether the university or its agent took advantage of that opportunity, and whether Schmidt was thereby misled. (*Jordan v. Guerra*, *supra*, 23 Cal.2d at p. 476.) If Schmidt prevails on this claim of fraudulent inducement, then the release provisions in the 2010 settlement agreement are binding only to the extent Schmidt actually intended (*Frusetta v. Hauben*, *supra*, 217 Cal.App.3d at p. 557), and under that circumstance the release provisions would not bar this action.

25

By the foregoing, we do not intend to suggest that a finding of fraudulent inducement is a foregone conclusion here. Depending on all of the evidence that is ultimately presented, a trier of fact could conclude that Salinas did not intentionally mislead Schmidt as to the scope of the release in the proposed agreement. As we have noted, Salinas told Schmidt the "suits that you *have* will continue forward and will not be affected by this Settlement Agreement & Release." (Italics added.) A trier of fact could find that because Schmidt had not yet filed the present lawsuit, she did not "have" this suit at the time she signed the settlement agreement, and thus there was no misrepresentation. It would also be possible for a trier of fact to find that Salinas simply did not understand the legal import of the release language, and thus did not intend to mislead Schmidt or misrepresent the effect of the proposed agreement.

"The elements of fraud are (a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." (*Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 294.) "Fraud in the inducement is a subset of the tort of fraud." (*Ibid*.) Fraud in the inducement occurs when the promisor knows what she is signing but her consent is induced by fraud. (*Id*. at pp. 294-295.) Mutual assent is present and a contract is formed, but the contract is voidable by virtue of the fraud. (*Id*. at p. 295.) Here, following a full presentation of the evidence at trial, it could be determined that the elements for fraud in the inducement are not present. For our purposes, however, it is sufficient to conclude that there is a triable issue of material fact that precludes summary judgment.

### III

*Exhaustion Of Administrative Remedies*

*Under The California Whistleblower Protection Act*

As we have noted, as an alternate basis for summary adjudication of Schmidt's fifth cause of action for violation of the California Whistleblower Protection Act (Gov.

26

Code, § 8547 et seq.), defendants contended there was no evidence Schmidt exhausted her administrative remedies.  The trial court did not reach this argument because it granted summary judgment based on the 2010 settlement agreement.  Having concluded that the trial court erred in that ruling, we must now resolve this one remaining issue: namely, can part of the summary judgment -- specifically, summary adjudication of the fifth cause of action -- be upheld based on Schmidt's failure to exhaust her administrative remedies?  We conclude it cannot be because of the insufficiency of the record on appeal.

Subdivision (a) of Government Code section 8547.12 provides as follows:  "A California State University employee, including an officer or faculty member, or applicant for employment may file a written complaint with his or her supervisor or manager, or with any other university officer designated for that purpose by the trustees, alleging actual or attempted acts of reprisal, retaliation, threats, coercion, or similar improper acts for having made a protected disclosure, together with a sworn statement that the contents of the written complaint are true, or are believed by the affiant to be true, under penalty of perjury.  The complaint shall be filed within 12 months of the most recent act of reprisal complained about."  Subdivision (c) of the statute provides in pertinent part that "any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a university employee, including an officer or faculty member, or applicant for employment for having made a protected disclosure shall be liable in an action for damages brought against him or her by the injured party. . . .  However, any action for damages shall not be available to the injured party unless the injured party has first filed a complaint with the university officer identified pursuant to subdivision (a), and the university has failed to reach a decision regarding that complaint within the time limits established for that purpose by the trustees.  Nothing in this section is intended to prohibit the injured party from seeking a remedy if the university has not satisfactorily addressed the complaint within 18 months."

27

In moving for summary adjudication on the fifth cause of action based on failure to exhaust administrative remedies, defendants asserted there was no "evidence in this case that, within the time period required by Government Code section 8547.12, [Schmidt] filed a written complaint with a University official supported by a sworn statement that the contents of the written complaint [were] true, or [were] believed by plaintiff Schmidt to be true, under penalty of perjury." The foregoing argument, contained in their memorandum of points and authorities, did not reference their separate statement of facts, or any other document for that matter. Thus, looking at the memorandum alone, we are at a loss to know the evidentiary basis for defendants' assertion. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855 [a defendant moving for summary judgment may "present evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence -- as through admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing. But . . . the defendant *must* indeed present 'evidence' "], fn. omitted.)

Schmidt did not include defendants' separate statement in her appendix, and defendants did not submit their own appendix to remedy that omission, so we cannot directly reference that statement ourselves. *Schmidt's* separate statement does show that defendants' undisputed fact No. 65 addressed this point by asserting there was no evidence that Schmidt filed the complaint required by Government Code section 8547.12 within the time period required by that statute. According to Schmidt's separate statement, the supporting evidence defendants cited for their fact No. 65 was their "Request for Judicial Notice." Unfortunately, Schmidt did not include defendants' request for judicial notice in her appendix, and (again) defendants did not remedy that omission by including it within an appendix of their own. Thus, based on the record before us, we are unable to verify whether defendants offered any evidence to support their factual assertion that Schmidt never filed the complaint required by Government Code section 8547.12 within the time period required by that statute.

Absent verification that defendants produced evidence sufficient to support their motion for summary adjudication of the fifth cause of action based on failure to exhaust administrative remedies, we cannot affirm the trial court's resolution of that cause of action on this alternate ground.

## DISPOSITION

The judgment is reversed, and the case is remanded to the trial court with directions to vacate its order granting defendants' motion for summary judgment and enter a new order denying defendants' motion for summary judgment or summary adjudication. Schmidt shall recover her costs on appeal. (Cal. Rules of Court, rule 8.276(a)(2).)


       ROBIE       , Acting P. J.


We concur:


       BUTZ       , J.


       MAURO       , J.